UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CENTRAL BUICK, GMC, INC. and
CENTRAL BUICK, GMC, INC., in the name
of FLORIDA DEPARTMENT OF HIGHWAY
SAFETY AND MOTOR VEHICLES and
STATE OF FLORIDA for the use and benefit of
CENTRAL BUICK, GMC, INC.,

    Plaintiff,

vs.                                          Case No. 8:15-cv-2393-T-27AAS

GENERAL MOTORS LLC,

    Defendant.
_____/

## ORDER

**BEFORE THE COURT** are the parties' cross-motions for summary judgment (Dkts. 44, 49), and the respective responses (Dkts. 52, 54). Central Buick GMC, Inc. brought this single count complaint for injunctive relief pursuant to § 320.695 of Florida's Dealer Protection Act, §§ 320.60-320.70. Central contends that on June 17, 2015, General Motors LLC wrongfully sought to terminate the parties' franchise agreement in violation of Fla. Stat. § 320.641(3). Within the statutory 90-day notice period, Central filed a complaint in Polk County Circuit Court for a determination of whether the termination is unfair or prohibited and to enjoin GM from terminating the agreement.[1] GM subsequently removed the action on the basis of diversity jurisdiction. Because there are disputed

---

[1] Central seeks a jury trial on all triable issues. A motor vehicle dealer may apply to the court for a permanent injunction restraining a manufacturer from violating the provisions of the Dealer Protection Act, and the court may issue an injunction "upon a hearing and for cause shown." Fla. Stat. § 320.695. And, to obtain a permanent injunction under Florida law, Central must show a violation of a clear legal right, an inadequate remedy at law, and that irreparable harm will occur absent injunctive relief. *Liberty Counsel v. Florida Bar Bd. Of Governors*, 12 So. 3d 183, 196 n. 7 (Fla. 2009). Central, therefore, seeks a jury trial on whether the termination violates Fla. Stat. § 320.641(3).

1

facts regarding the termination, the parties' motions will be DENIED, with one exception regarding Central's challenge to its 2011 APR modification.

**I. Undisputed Material Facts**

Central is an independent automobile dealership in Winter Haven. Prior to the financial crisis of 2008, it operated as a Pontiac, Buick, and GMC dealership. (Dkt. 45-19 ¶¶ 2-4). After 2008, and as part of GM's bankruptcy, the Pontiac line of vehicles was discontinued and Central reorganized as a Buick-GMC dealership. (Dkt. 45-19 ¶ 4). Effective November 1, 2010, the parties entered into a Dealer Sales and Service Agreement ("DSSA") for Buick motor vehicles and GMC light duty trucks. (Dkt. 27-2). Article 9 of the DSSA sets forth Central's performance obligations as a dealer:

> Satisfactory performance of [Central's] sales obligations under Article 5.1 requires [Central] to achieve a Retail Sales Index equal or greater than 100. If [Central's] Retail Sales Index is less than 100, [Central's] sales performance will be rated as provided in the General Motors Sales Evaluation process. . . . In addition to the Retail Sales Index, [GM] will consider any other relevant factors in deciding whether to proceed under the provisions of Article 13.2 to address any failure by [Central] to adequately perform its sales responsibilities. [GM] will only pursue its rights under Article 13.2 to address any failure by [Central] to adequately perform its sales responsibilities if [GM] determines that [Central] has materially breached its sales performance obligations under this Dealer Agreement.

(Dkt. 27-2 at 22). And, Article 13.2 sets forth the procedures for GM to terminate the agreement:

> If [GM] determines . . . that [Central] has failed to adequately perform its sales or service responsibilities relating to customer satisfaction and training, [GM] will review such failure with [Central].
>
> As soon as practical thereafter, [GM] will notify [Central] in writing of the nature of [Central's] failure and of the period of time (which shall not be less than six months) during which [Central] will have the opportunity to correct the failure. If [Central] does not correct the failure by the expiration of the period, [GM] will so advise [Central] in writing.
>
> If, however, [Central] remains in material breach of its obligations at the expiration of the period, [GM] may terminate this Agreement by giving [Central] 90 days advance

2

written notice.

(Dkt. 27-2 at 31).

On May 19, 2014, GM notified Central that it breached the DSSA by failing to meet sales and customer satisfaction performance obligations in 2012 and 2013. (Dkt. 45-17). Specifically, Central was ranked last in Florida in Sales Performance based on its Retail Sales Index ("RSI") of 39.5 for 2012 and 37.0 for 2013, and Central's Customer Satisfaction Performance was below the region's performance.[2] (Dkt. 45-17). Central was provided six months, from July 1, 2014 through December 31, 2014, "to correct its performance deficiencies." (Dkt. 45-17 at 2). At the end of 2014, Central was ranked 54 of 63 Florida dealers based on its RSI of 61.3, placing it in the bottom 15% of eligible dealers in the state with an "unsatisfactory" rating.[3] (Dkt. 45-18 at 2,3).

On June 17, 2015, GM notified Central of Central's 2015 first quarter rankings. (Dkt. 45-23). Central ranked 52 of 63 based on its RSI of 62.14, and its dealer rating improved from "unsatisfactory" to "needs significant improvement." (Dkt. 45-23). A "needs significant improvement rating" placed Central with a RSI lower than 84.9 but not in the bottom 15% of dealers in the state. (Dkt. 45-23 at 2). Stated differently, Central moved out of the bottom 15% of dealers in the first quarter of 2015.

The following day, June 18, 2015, GM notified Central that it was terminating the DSSA

---

[2] RSI represents a dealer's actual total retail sales divided by the dealer's expected sales. (Dkt. 46).

[3] GM rated dealers utilizing the following scale:

Superior - 100 RSI or greater and in top 15% of eligible dealers in the state
Satisfactory - 100 RSI or greater (but not in top 15% of eligible dealers)
Needs Improvement - 85.0 - 99.9 RSI
Needs Significant Improvement - 84.9 RSI or less (but not in the bottom 15% of eligible dealers)
Unsatisfactory - 84.9 RSI or less and in the bottom 15% of eligible dealers in the state

(Dkt. 45-23 at 2).

effective September 16, 2015 because Central failed to reach a RSI of 100 during the cure period of July 1, 2014 through December 31, 2014. (Dkt. 27-8). Central's RSI for the cure period was 68.2. (Dkt. 27-8). This action followed.

## II. Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citation omitted). On the other hand, "'[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.'" *Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994)). And, "[w]here parties file[ ] cross-motions for summary judgment[,] . . . each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."

4

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 648 n.12 (2d Cir. 2016) (alterations in original, quotation marks and citation omitted).

## III. Discussion

Section 320.641 of Florida's Dealer Protection Act regulates the cancellation of franchise agreements between dealers and manufacturers. A manufacturer may terminate an agreement so long as it is "fair and not prohibited." Fla. Stat. § 320.641(3). A termination is unfair if

> it is not clearly permitted by the franchise agreement; is not undertaken in good faith; is not undertaken for good cause; or is based on an alleged breach of the franchise agreement which is not in fact a material and substantial breach; or, if the grounds relied upon for ... cancellation ... have not been applied in a uniform and consistent manner by the [manufacturer].

*Id.* The manufacturer has the burden of proving that the termination complies with the statute. *Id.*

Because this action is founded on statutory liability, Florida law applies. *Risley v. Nissan Motor Corp. USA*, 254 F.3d 1296, 1299 (11th Cir.), *opinion reinstated on reh'g sub nom. Risley v. Nissan Motor Corp. in USA*, 260 F.3d 1310 (11th Cir. 2001). And, "[i]n rendering a decision based on state substantive law, '[this Court is] bound to decide the case the way it appears the state's highest court would.'"[4] *Risley*, 254 F.3d 1296 at 1299 (quoting *e.g., Royal Ins. Co. of Am. v.*

---

[4] The Florida Supreme Court has not addressed Fla. Stat. § 320.641(3). "Where the state's highest court has not spoken to an issue, a federal court 'must adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise.'" *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001) (quoting *Ins. Co. of Am. v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1040 (11th Cir. 2001)). Florida's intermediate appellate courts, however, have not addressed the application of Fla. Stat. § 320.641(3). Indeed, GM relies heavily on decisions by Florida's administrative law judges after evidentiary hearings. *See Hampton Auto. Grp., Inc. v. Nissan N. Am.*, 2012 WL 5305152, DOAH Case No. 11-1157 (Fla. Div. Admin. Hrgs. 2012) (final order adopted by DHSMV on Oct. 24, 2012); *Love Nissan, v. Nissan N. Am.*, 2005 WL 1662263, Case No. 04-002247 (Fla. Div. Admin. Hrgs. 2005) (adopted by DHSMV on April 12, 2006); *Bill Gallman Pontiac v. Gen. Motors Corp.*, 1990 WL 749323, Case No. 89-000505 (Fla. Div. Admin. Hrgs. 1990) (adopted by DHSMV on Feb. 28, 1991) (applying an earlier version of Fla. Stat. § 320.641). Yet, decisions by Florida's administrative law judges are not binding on this Court. *See e.g. Ernie Haire Ford*, 260 F.3d at 1290; Fla. Stat. § 120.68(2)(a) (judicial review of an agency final action is by Florida's intermediate appellate courts); *Dep't of Highway Safety & Motor Vehicles v. Alliston*, 813 So. 2d 141, 144 (Fla. 2d DCA 2002).

In "attempting to forecast state law [a federal court] must consider whatever might lend it insight, including

*Whitaker Contracting Corp.*, 242 F.3d 1035, 1040 (11th Cir.2001) (internal quotation marks and citation omitted)).

### (1) Clearly Permitted

GM contends that the termination is clearly permitted by the DSSA because Central failed to achieve an RSI equal or greater than 100 during the cure period. Central counters that GM failed to consider "other relevant factors" before proceeding with termination and therefore, the termination is not clearly permitted.

The DSSA is a contract between the parties, and contract interpretation is ordinarily a matter of state law. *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). Article 17.12 of the DSSA provides that Michigan law governs its interpretation. (Dkt. 45-24 at 38). Under Michigan law, "[a]bsent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 870, *reh'g denied sub nom. Innovation Ventures, L.L.C. v. Liquid Mfg., L.L.C.*, 884 N.W.2d 573 (Mich. 2016). Therefore, determining if the termination is clearly permitted under Fla. Stat. § 320.641(3) requires an interpretation of the DSSA under Michigan law. *In re Chira*, 567 F.3d at 1311; *Innovation Ventures*, 855 N.W. 2d at 870.

Article 9 sets forth the procedure for GM to follow before initiating the termination process under Article 13.2. First, GM considers a dealer's RSI and other relevant factors before determining whether to proceed with the Article 13.2 procedures. GM will only pursue its Article 13.2 rights if

---

'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1332 n. 5 (11th Cir. 2005) (quoting *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 663 (3d Cir.1980)). The decisions relied on by GM are considered, but accorded little weight. Florida's administrative law judges served as both the judge and jury, which is dissimilar to the role of this Court at summary judgment.

it determines the dealer is in material and substantial breach of the DSSA. GM proceeds with Article 13.2 by reviewing the failure with the dealer and providing the dealer a cure period within which to correct the failure. If the dealer remains in material breach after the cure period, GM may terminate the DSSA with 90 days advance written notice.[5]

Central argues that GM sent the notice of cure without considering Central's Area of Primary Responsibility ("APR"). A dealer's APR is comprised of U.S. census tracts that GM assigns to dealers. (Dkt. 46 ¶ 3). The APR is utilized to determine a dealer's expected sales, which is then utilized to determine a dealer's RSI. (Dkt. 46 ¶¶ 1-2).

The DSSA provides that GM, "in addition to the [RSI]," "will consider any other relevant factors in deciding whether to proceed" with the termination process.[6] (Dkt. 45-24 at 22). Stated differently, the actual words of the DSSA require GM to consider relevant factors. *Innovation Ventures*, 885 N.W.2d 861 at 870. And, Bradley Flaaen, GM's regional director for the Southeast region, testified that a dealer's APR is a relevant factor to consider. (Dkt. 45-2 at 34:4-6, 95:3-15, 170:21-24, 171:1-4).

Effective July 28, 2011, Central's APR was modified to include additional census tracts.

---

[5] GM utilizes the DP2 process to provide its poorest performing dealers an opportunity to improve before the DSSA is terminated. (Dkt. 45-13 at 5). Although GM contends that the DP2 process is not the termination process outlined in Articles 9 and 13.2, in all practicality, it appears to be. Indeed, Central was terminated pusruant to the DP2 process. (Dkt. 45-20 at 5).

The DP2 process places dealers in three different categories: standard letter, quarterly business contact, and notice of cure, based on either the dealer's RSI and/or state rank and the number of years a dealer has been either in a certain category or a poor performer. (Dkt. 45-13 at 5). The categories are progressive. A dealer only qualifies for the notice of cure if it had previously been a quarterly business contact and if it was ranked the worst or second worst dealer in the state based on two consecutive annual RSIs. (Dkt. 45-13). A dealer is placed in the notice of cure category before it is eligible for termination. Effectively, the notice of cure category is the Article 13.2 termination process. If the dealer does not reach an RSI of 100 during the cure period, GM can proceed with termination.

[6] Expected sales is determined by the statewide market share for a particular type of vehicle segment multiplied by the total retail motor vehicle registrations in the dealer's APR for the same vehicle segment. (Dkt. 46). RSI is a representation of a dealer's actual sales over expected sales. (Dkt. 46).

7

(Dkt. 45-7). According to Plaintiff's expert, Joseph Roesner, "[a]ll other things being equal," adding census tracts to an APR will decrease a dealer's RSI, while subtracting census tracts will increase a dealer's RSI. (Dkt. 45-5 ¶ 18). Central's owner, Allen Mervis, avers that he consistently complained about Central's APR modification to his district manager and zone manager. (Dkt. 45-19 ¶ 6).

On January 26, 2013, Mervis memorialized his complaints in a letter to GM. (Dkt. 45-14). In 2013, GM and Mervis were communicating regarding Central's APR, and, as of May 31, 2013, GM proposed to remove two tracts from Central's APR. (Dkt. 45-5 ¶ 55). GM removed the two tracts effective January 1, 2014. (Dkt. 50-1 at 42, 43). Although Central's APR was in dispute in 2013, GM did not consider this a relevant factor before relying on Central's 2013 RSI when proceeding with termination.[7] (Hilgardner Depo., Dkt. 53-2 at 232:18-233:5).

GM argues that Florida's administrative law judges have found in unrelated cases, after disputed evidentiary hearings, that a dealer's failure to meet its sales obligations, the RSI, is a substantial and material breach permitting termination. GM, however, fails to acknowledge that the DSSA provides that it "will consider any other relevant factors" in deciding whether to proceed with the Article 13.2 termination process **and** that Flaaen testified that a dealer's APR is a relevant factor to consider. And, despite the language of the DSSA and Flaaen's testimony, Central's APR was not considered. Indeed, a reasonable juror could find that the termination was not clearly permitted under these circumstances.

In sum, GM's witnesses dispute whether a dealer's APR is a relevant factor to consider

---

[7] Roesner recalculated Central's 2013 RSI based on the 2014 APR adjustment and opined that based his recalculations, Central would not have qualified for a notice of cure. (Dkt. 45-5 ¶20).

8

before proceeding with the termination process, Article 9 of the DSSA provides that GM "will consider any other relevant factors in deciding whether to proceed" with the termination process, and the APR used to determine Central's RSI for termination purposes was in dispute. Accordingly, whether the termination was clearly permitted cannot be resolved at summary judgment and the parties' motions will be denied on this issue.

**(2) In Good Faith and For Good Cause**

Central argues that the termination was not in good faith under the statute because GM failed to supply it with adequate quantities of motor vehicles to meet its sales goals. GM counters that it met its supply obligations and acted in good faith.[8]

As discussed, Florida's courts have not addressed good faith under Fla. Stat. § 320.641(3). The Eleventh Circuit, in analyzing a breach of contract claim by a dealer against a manufacturer, found that under Florida contract law, the duty of implied covenant of good faith limits a party's discretion to act. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001). And, "one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Id.* It follows that Florida courts would apply principles of contract law when analyzing whether a termination was in good faith under Fla. Stat. § 320.641(3). Accordingly, in applying the good faith standard under Florida law, GM has the burden of showing that its termination was "neither capricious nor in contravention of the parties' reasonable expectations," *Ernie Haire Ford*, 260 F.3d at 1291. Fla. Stat. § 320.641(3).

---

[8] As noted, GM's reliance on decisions by Florida's administrative law judges is unpersuasive. *See Hampton*, 2012 WL 5305152, at *22; *Love Nissan*, 2005 WL 1662263, at *20. The decisions do not analyze why the terminations were in good faith, but rather state in conclusory fashion that based on the findings of fact, the terminations were in good faith.

9

Generally, the question of good faith is reserved for the trier of fact. *See Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1300, 1303 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) (citing examples where breach of implied covenant of good faith is answered by jury); *Guardian Alarm Co. of Michigan v. May*, 24 F. App'x 464, 470 (6th Cir. 2001) (same under Michigan contract law); *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004) (same in Florida insurance bad faith cases). The question of good faith will be for the jury in this case.

Article 6.4.1 provides that "[Central] agrees to purchase and stock and [GM] agrees to make available . . . a mix of models and series of Motor Vehicles . . . in quantities adequate to enable [Central] to fulfill its obligations in its [APR]." (Dkt. 27-2). Central argues that GM cannot in good faith terminate the DSSA for failure to meet its sale performance obligations when GM did not provide the necessary vehicles for it to sell. GM counters that its vehicle allocation system ensures a fair and equitable distribution of vehicles across its dealer network. (Dkt. 52 at 16).

The record indicates that from 2011 through 2013, GM's allocation of vehicles to Central fell short of Central's required sales. (Dkts. 45-11, 45-25, 45-26). GM contends that its allocation method is fair, and it cannot allocate to a dealer all of the vehicles it orders because of state franchise laws. (Muiter Depo., Dkt. 53-3 at 25:20-25). While GM suggests that Central should have ordered more vehicles, it does not show that more vehicles would have been allocated to Central if more were ordered. (Muiter Depo., Dkt. 45-3 at 252:11-25). While the allocation method may be fair, a reasonable juror could find that GM's allocation method rendered it impossible for Central to meet its sales goals and that the termination is accordingly not in good faith. *See e.g. Ernie Haire Ford,*

10

260 F.3d at 1291. Based on these facts, whether GM acted in good faith in terminating the DSSA will be for the jury to determine. Accordingly, the parties' respective motions on this issue will likewise be denied.[9]

### (3) Material and Substantial Breach

GM contends that Central was in material and substantial breach of the DSSA because it failed to meet 100 RSI during the cure period. Deciding whether Central was in material and substantial breach in 2014 necessarily requires a determination of whether the termination was clearly permitted. Since whether the termination was clearly permitted is left for the jury, whether the termination was based on a material and substantial breach will be left for the jury. *See Access Ins. Planners, Inc. v. Gee*, 175 So. 3d 921, 924 (Fla. 4th DCA 2015) ("The occurrence of a breach, or breaches, is a question of fact."). And, the parties' respective motions on this issue will be denied.

### (4) Uniform and Consistent Manner

Central's contention that the method GM used to terminated the DSSA was not uniform and consistent is duplicative of its argument that the termination was not clearly permitted. Specifically, Central contends that GM's failure to consider Central's disputed APR was inconsistent with the DP2 process rendering the termination in violation of Fla. Stat. § 320.641. As previously discussed, this will be for the jury to determine. Accordingly, the parties' respective motions on this issue will be denied.

### April 22, 2011 Notice of APR Modification

Central seeks to void the modification of its APR effective July 28, 2011 arguing that GM's

---

[9] Because summary judgment will be denied on this issue, Central's argument that the termination is barred by the doctrine of prevention of performance is not discussed.

11

April 22, 2011 notice of modification failed to comply with Fla. Stat. § 320.641(1)(a). GM contends that Central's claim is untimely. I agree.

Pursuant to Fla. Stat. § 320.641(1)(a) a manufacturer

> shall given written notice to the motor vehicle dealer and the department . . . of the [manufacturer's] intention to modify a franchise . . ., which modification or replacement will adversely alter the rights or obligations of a motor vehicle dealer under an existing franchise agreement or will substantially impair the sales, service obligations, or investment of the motor vehicle dealer, at least 90 days before the effective date thereof, together with the specific grounds for such action.

The failure to comply with the 90-day notice period and procedures "shall render voidable, at the option of the motor vehicle dealer, any discontinuation, cancellation, nonrenewal, modification, or replacement of any franchise agreement." Fla. Stat. § 320.641(1)(b). And, a dealer "who receives a notice of intent to . . . modify . . . may, within the 90-day notice period, file a petition or complaint for a determination of whether such action is [a] . . . prohibited . . . modification[.]" Fla. Stat. § 320.641(3).

Therefore, under Fla. Stat. § 320.641(3), a challenge to the notice of modification must be filed within the 90-day notice period.[10] *See e.g. Chrysler Corp. v. Florida Dep't of Highway Safety & Motor Vehicles*, 720 So. 2d 563, 566 (Fla. 1st DCA 1998) (challenge to amendment to franchise agreement filed within 90-day notice period); *Gettel Gainesville, Inc. v. BWM of N. Am., LLC*, DOAH Case No. 13-1204, 2013 WL 3388290, *3 (Fla. Div. Admin. Hrgs. 2013) (adopted by DHSMV on June 28, 2013) ("[t]here is nothing in the language of section 320.641 to require or imply that the 90-day time limitation can be extended . . . if the dealer receives such notice and, at some undetermined time beyond 90 days, decides to challenge the sufficiency of the notice").

---

[10] Even assuming that Central could challenge the notice outside the 90-day notice period, a claim based on a violation of Fla. Stat. § 320.641(1) would be barred by the applicable statute of limitations. Fla. Stat. § 95.11(3)(f) (four year statute of limitations applies to actions founded on statutory liability).

Central filed this action in September 2015, more than four years after the 90-day notice period expired. Central's challenge to the April 22, 2011 notice of APR modification is therefore untimely. GM's motion for summary judgment on this issue will be granted, and Central's motion will be denied.

**IV. Conclusion**

Based on the foregoing, Central's Motion for Summary Judgment (Dkt. 44) is **DENIED** and GM's Motion for Summary Judgment (Dkt. 49) is **GRANTED in part** and **DENIED in part**.

**DONE AND ORDERED** this 28th day of June, 2017.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to:
Counsel of Record